Alce v. Tisch, case number 25861. Hold on, Mr. Grisham. Good morning. Good morning, Your Honors. May it please the Court, Will Burke on behalf of the plaintiffs' appellants in the Calci matter. The District Court below erred in concluding that electronic dart guns and electronic stun guns are not literally arms within the meaning of the plaintext of the Second Amendment. As a matter of textual interpretation of the Constitution, that was an error because there's nothing in the text of the Constitution to suggest any limitation beyond that an item be a weapon. As a matter of interpretation of precedent, that was also an error, Your Honor, because there's nothing in either this Court's precedents nor in the precedent of the Supreme Court that suggests that there's anything other than asking whether or not an item is a weapon at the plaintext stage under Broome. What about Gomez? Excuse me, Your Honor? Our Gomez decision. Our decision in Gomez, which talks about a — the conducted issue implicating the right to armed self-defense and whether the weapons are in common use today for self-defense. That — doesn't that sort of build on and interpret the plaintext? Well, Your Honor, so the same statement was made in the Antoniuk decision by this Court. And I'm not familiar with the facts of Gomez, but in Antoniuk, the case was about the — was about sensitive places where firearms could be carried. It was dicta in that decision. And it was — If I tell you, I don't think it's dicta in Gomez. Let's assume it's not dicta. Okay. After Gomez. So let's talk about it as though it's not dicta. Okay. Well, Your Honor, I mean, I think the fact of the matter is that under, I think — is what you're telling me that there's a second circuit opinion saying that it is? From 2025. 159 F. 4th, 172. November 17, 2025. And, yeah, it found — again, it specifies that there's this question about in common use today legally for self-defense. And here, we're at the summary judgment stage, right?  So we're talking about the party with the burden having to present evidence. And I think, based on my look at the record, there's no evidence of common use or otherwise. Well, Your Honor, if I could just take one step back and talk a little bit about the standard first, and then I will get — we have evidence in the record. But the standard — I mean, as of Grant v. Lamont, this Court left that question open. So I can't remember the dates on Grant v. Lamont and whether Gomez postdates it, but — Lamont is August 2025. Thank you, Your Honor. So — Gomez postdates it. Well, Your Honor, the — let me talk about the record in the — or the evidence in the record, then. So we have put forward evidence both in the form of newspaper articles talking about the There's also, of course, the findings of several courts, Your Honor. The court below is the only one in the country that I'm aware of that has ever found that stun guns and electronic arms are not arms in common use for self-defense. This case — this came up in O'Neill v. Nerona, where the court found that there were 6.5 million stun guns or electronic arms. The State of New York stipulated in Navatabile that there were 4.5 million stun guns and 300,000 tasers. And then, of course, there's Justice Alito's concurrence in Caetano in which he notes that there's 200,000 of these at least, and that was, again, based on old data. And they were legal in all 45 states. And I think that's another thing this court needs to consider when it's weighing whether or not an arm is in common use. And again, this is an area in which the evidence clearly demonstrates that tasers are in common use. When Justice — when the Supreme Court asks whether an arm is an ordinary arm, it's in staples. It asked — it said that semiautomatic weapons are commonplace and the sorts of arms that are — have been long considered lawful possessions. The court has looked at questions not just of pure numbers, but also of things like whether the item is heavily regulated and in how many jurisdictions. When Justice Alito wrote his Caetano concurrence, there were 45 states in which this was legal to purchase. Now it's 50. These are not even regulated as firearms under federal law. What is the common use of a stun gun? How is it — you talk about these numbers, and I think you prudently acknowledge that numbers by themselves are not enough. Would you agree with that? Well, I think they can be enough in a certain case. If we're dealing with millions of these things, I think they're common. Well, it's — right. It's 330 million, okay. Right. But if the numbers analytically are necessarily enough, correct? Well, Your Honor, I think in this case numbers and the widespread legality is enough. Well, when you say and — Yes, yes. So the numbers are not analytically necessarily enough. Not necessarily enough, Your Honor. Okay. So then we look at what on top of the numbers? I think you also look at how commonly legal they are. So, again, these are not banned in 50 states. These are legal to acquire. Under federal law, they're not even regulated as firearms because they don't use gunpowder. And they're — you can buy them at retail in 50 states. And I don't think that if we were dealing with a dangerous, unusual weapon, which, as we've said in our brief, we think the opposite of a common-use weapon is a weapon that's dangerous and unusual, I don't think the American people would stand by idly while their fellow citizens were purchasing a dangerous and unusual weapon at retail in all 50 states. There would be a much bigger movement for regulation of these items. Did you put in in the connection with some judgment record how these stun guns are used, or did you rely on the number of stun guns? We did not put in evidence about how these were used, except for the evidence of how our plaintiffs want to use them, Your Honor. Given your answer to me about the analysis, right, why was it inappropriate to then grant some judgment on the ground that all you had provided was evidence of numbers without further evidence or additional evidence of how the guns are used and whether they're used en masse for a lawful purpose? Your Honor, because I don't think that's part of our burden under the plaintext, or part of the common — because I don't think that that is necessary. Is it your burden to show the numbers? Your Honor, I think that — Is it your burden to show — is it the plaintiff's burden in the context of this litigation to show how many people or how many stun guns there are, the tasers, and how many people use them? No, Your Honor, I don't believe it is. So you think that that's the government's entire burden to show that? Yes, Your Honor, I think. And on summary judgment, then you don't have any — if they put in some evidence, for example, of the use of stun guns in inappropriate ways and how dangerous they can be, then what is your burden on summary judgment? So I'm very focused on the rule, Rule 56. Sure. What is your burden then? So as the state puts in evidence showing that these are being misused and that's their predominant use or something like that, they put that forward, that might be a way of proving that an arm is dangerous than usual if they're not being used for lawful purposes. And we would have then an obligation to try and refute that evidence, Your Honor. That would be part of our sort of defensive posture. But the burden would clearly be on the state to show that their ban is consistent — or in this case, sorry, the city — to show that the ban they're enforcing is consistent with our nation's historical tradition of firearm regulation. Well, no, no, no. So I'm thinking about step one, right? So they have introduced evidence, I think, that these stun guns need to be regulated. When I say stun guns, stun guns, dangerous. Sure. You understand that. Need to be regulated because there's a history of dangerousness. And if you look at the legislative history, there seems to be some — that seems to have been motivated in this act by this concern over the misuse of stun guns and of dangerousness. So they put that in. And then your burden would be to — I think, but you correct me if you think I'm wrong, Mr. Berkshire — to say two things, and this I take from your answer to my first question. One, there are a lot of these stun guns. So the numerosity issue, for lack of a better term, is taken care of and addressed. And at step one, they are used — commonly used for a lawful purpose. Is that correct? So what we — I think we would — I think I largely agree with you, Your Honor. What we would — Largely. I'm very focused on largely. Okay. Where do you disagree with me? Well, I think we could also show that the State's evidence is wrong, that these are not being misused. Correct? I mean, I think we could also disprove it by — Well, if that's the case, then — okay. Did you do that? So you're — in our papers, we hear we discuss a lot of the evidence the State has put forward. The State relies on it. No, no. Did you do that on the summary judgment record? We made the same arguments that these are not used. No, no, no. Not arguments. Did you provide some evidence? No, Your Honor. We don't have evidence that these are not — we don't have negative evidence, essentially, of these not being used. There's almost no evidence that they are being used for unlawful purposes. But a defendant at summary judgment can prevail on summary judgment by showing a lack of evidence in the record to support an element on which the plaintiff will bear the burden of proof. Correct. The question of in common use is a step one question on which plaintiffs bear the burden of proof. And the defendants have pointed to an absence of evidence in the record to support a finding of common use. Why is that not sufficient to support summary judgment? Because, Your Honor, I believe there was evidence in the record to show common use. Evidence, as opposed to statements of other courts or — Well, Your Honor, again, this goes to something we — New York Post's article, stuff like that. So, Your Honor, in this context, I think that is the sort of things that you or the court can look at, even at summary judgment. But we look at — when we look at — we take judicial notice of decisions and things, we take judicial notice of the existence, not of the truth of the fact that's stated in another court's decision, right? Right, but this isn't even — what I'm talking about here, Your Honor, is not even judicial notice. So Federal Rule of Evidence 201 covers judicial notice, and it applies only to adjudicative facts. And these facts we've explained in our briefs here and we argued below are legislative facts, facts — general facts about the world that are relevant to shaping legal rules. So what was the compelling evidence that you can point us to about common use? Is it, Your Honor — No, you had a good New York Post article. What else do you have? There's a Congressional Research Service article we cite in our papers, Your Honor. We have got the decisions of those several courts I listed, O'Neill v. Nerona, Justice Alito and Caetano. There's this — the Northern District of New York and Avotabile v. Beach, all of which — What did any of them say about common use in New York? So Avotabile — sorry, common use in New York specifically, Your Honor? Yes. Well, I think, first, the New York Post article does specifically address common use in New York. I've been on the court for a while. I mean, I'm an old guy. I can't recall any kind of substantial reliance on — I don't mean the New York Post, but I can't recall any substantial reliance by this court on the New York Post. Well, so to take the question in two parts, Your Honor, going back to the point about whether or not there's common use in New York, I don't think that's the question. I think it's a national standard. The type of firearms and types of arms generally that are protected by the Second Amendment are the same in New York as they are in Texas. So we don't need to look at that. We can look at nationwide figures. And, again, we've got several cases we've cited where courts have found — and, again, the court below is an outlier. It's the only one I'm aware of that has found that these are not in common use. And courts have frequently looked at exactly these facts. So in People v. Webb, which is the case in Illinois that held Illinois' ban on these firearms or these electronic arms unlawful, the court said that it was essentially beyond dispute, and it cited to Justice Alito's concurrence in Caetano. This is also, I would add, Your Honor, when the Supreme Court in Heller was deciding whether or not handguns were in common use or the quintessential weapon for self-defense, it didn't have evidence in the record on that point. What it cited to indirectly through the court of appeals decision below was a social science research paper by Gary Kleck. So, I mean, this is the sort of topic on which I think courts are able to look at whatever evidence or whatever sources of information that are cited to them both in briefs or in a Rule 56 statement or in whatever format and can decide based on that whether an arm is in common use. I'd like to make—I see my timer has stopped running, so I'm not sure how much time I have left. I'll give you one more minute. And you reserve some minutes. I reserve two minutes for rebuttal as well. But I'd like to talk just briefly about danger as well. So this court's decision in Lamont made clear that another reason why an arm could be banned is if it's unusually dangerous. I mean, I think the taser or stun gun—again, please understand me talking about both when I say one. The context here is starkly different from anything this court was dealing with in Lamont or in really any other case involving firearms. On the dangerousness front, these are uniquely undangerous compared to almost any other mean of self-defense. And again, we've got plenty of discussion in our briefs on that point to prove that out. But if there's any other further questions— If we were to disagree with you, I take it you would say that we are creating a circuit split, right? Is there a circuit split? Well, so, Your Honor, it's a bit odd. I mean, there's an Illinois Supreme Court decision, and then there's several district court decisions. With great respect to the Illinois Supreme Court. Sure. No, yes. Federal circuit split somewhere. So, no, Your Honor. O'Neill v. Nerone was not appealed. The State chose not to appeal when it lost on this issue. So we also—Hanson, for example, would not—is not—would not be contrary. I mean, Hanson, I think—Hanson's about assault weapons and AR-15s. So, I mean, Hanson does suggest that it thinks that at least Caetano establishes, and we think as well that Caetano establishes that these are arms within the meaning of the Second Amendment, but I don't think it's a holding of— Right, right. So it's dicta. Yes. Okay. You heard that. And so, really, you're pointing us to Justice Alito and his concurring opinion and telling us you've got one member of the United States Supreme Court on your side. Well, I think we've for sure got that one. I think that there are several others who have reasoned in the same way that we're discussing here. So— So why don't you—we'll hear from you on that. Sure. Thank you, Your Honor. Mr. Brookstone, thank you. And we'll hear from the city. So I think I heard from Mr. Brookstone, beware the ides of March. Where we have a signal from one justice. Yeah. Well— Go ahead. May it please the Court, Alita Drucker on behalf of the city. Yeah, the fundamental principles of party presentation in a Rule 56 motion, we have cross motions for summary judgment. They just didn't carry the burden. We're not saying stun guns aren't even arms. We're just saying there's nothing here— I hear you. Sorry. We aren't saying that stun guns aren't arms. We're saying there's nothing in the record that was presented to the district court that would have allowed that judge to make a determination one way or the other. And that's not how we litigate cases. Any case, not just the Second Amendment case. That's the whole—the entirety of the holding from the district court is that what the plaintiffs supplied was not enough to make a conclusion on— What is it that they supplied in your view? What is it that they failed to supply? Okay. So after Gomez from November of last year, I think it's very clear that plaintiff's burden at step one under Bruin in this circuit is to show common use—to show that the arm that they intend to carry, among other things, is in common use for lawful purposes, primarily self-defense, is something Lamont says, and that's still in the air. Common use is not a purely numerical test, as this Court has already recognized, and my adversary doesn't dispute. But numbers, number one, we don't even have that. We don't know how many. Two different objects, by the way. Tasers and stun guns, two completely different things. We don't know how many of either or both are in circulation today. We have nothing from them about that. The only thing— Hundreds of thousands of tasers and stun guns have been sold to private citizens. Where do you get that from? So Justice Alito, in that, is citing a trial court decision, which in turn is citing this 2009 law review article by Eugene Volkel, and that article, in turn, is not citing anything. It's just making a statement. If you read the law review article, it seems like there's maybe referencing a newspaper article, which in turn is not referencing anything. And this was not—these law review articles were not part of this record? They were—I mean, they were not plaintiffs— I mean, everyone has cited to this one law review article, but that is not the—that is not evidence. That's not any information about what's actually happening on the ground today. And, in fact, the only thing—and the other thing in that record was— and the other thing is that we said that these were widely banned as of 2009 based on that same law review article, which did a survey. For the first time on reply, this is here in this Court, not before the district court. They're like, oh, well, actually the law has been changing in some places. That's not how we litigate a case. The way we do that is you go to the district court judge and you provide all the information to allow them to make that assessment. So— So what you're suggesting is an extremely narrow resolution of this that's based on the requirements of Rule 56? Yes. The plaintiffs here haven't carried that burden. I think that this Court has already—to the extent that we're talking about tension within the Supreme Court, within the circuits, among the circuits, about how Bruin Step 1 should be analyzed, there is tension. But that tension already exists. And this Court need not reach that tension, right? I mean, the Gomez decision itself firmly puts the Second Circuit in the camp of putting Bruin Step 1 on the plaintiff and including common use, which— and, you know, that decision also says, and I'll quote it, as historically understood, which is another point of contention here. They would like it to be a purely dictionary definition. We say that originalism works by looking at the text in the context of what it means. But either way, those tensions exist, but they're not here. They're not at play here. What's at play here is they just didn't carry that burden on 56 to let the district court make a determination about common use, about typicality, how often these things are used. Even if there were a gazillion stun guns manufactured, what we know from the record from the newspaper articles they supplied is that they are very useful for crowd control by the police. So what we know is there is a law enforcement use. And there's no dispute about that, that there are many law enforcement uses. The NYPD uses them. But the NYPD uses them—the NYPD's use of them does not establish that they are commonly used for self-defense by ordinary people. And that definition— And the NYPD also has got machine guns. Exactly. We have sonic cannons. But you cannot get a sonic cannon because it's not protected by the Second Amendment. Right? Those are military weapons. And the difference and the reason that that's a distinction that matters is because Heller codifies a preexisting right that existed at the founding. Right? Heller doesn't say—when Heller said there's an individual right to carry a firearm, a handgun, there was—the court was saying people, ordinary people, not the military. Ordinary people had these things and they would have been prepared to bring them to muster to defend against the Federal Government. Right? That's the type of weapon we protect. The ordinary weapon protected for—that is kept primarily for purposes of self-defense. That's not—there's no evidence in the record here that could allow the district court to make a conclusion that a stun gun falls in that same category. And there are— And maybe we're getting far afield of the narrow resolution that you've been seeking here, but now that you've opened the door a little bit, a stun gun is not— or when I say stun gun, I appreciate that there are differences, but these are not lethal in the same way as handguns necessarily. They're not meant to be lethal. Is that fair? I think they were originally designed to be less lethal. Less lethal. Less lethal. Okay. So, but look, I'm having a hard time agreeing with the argument that a stun gun or a taser is either not a subset of a handgun within the meaning of valor or something, some category of weapons that is really not much less lethal, I guess is the term you're using, or not lethal at all. My point about their use for military purposes is to say that the plaintiff's burden was not just to show that there are many in existence, which they didn't even show, but that there are many in existence and that common use is common use for lawful purposes by ordinary people. And that they didn't show, right? There's nothing about how ordinary— how many tasers and things are owned by ordinary civilians, which was the burden that they bore under Gomez, under Antonyuk, under a lot of this Court's precedent. Now, for the second question— Maybe I'm going to channel Mr. Berger for a second before the rebuttal. Isn't it obvious? In other words, he's asking for us, and I think for the district court, to, in effect under Rule 201, take judicial notice that these tasers and stun guns are all over the place, and maybe that's what prompted, with the help of the article that you mentioned, Justice Alito, to say what he said in the concurring opinion. But do you think that's true? I don't know that that's true, and the district court didn't know that that's true. This sort of, I have a common-sense feeling that this is a true fact, that some people carry tasers. I don't know that that's true, and that's not how we make law. We ask that the plaintiff provide some basis in newspaper articles, in manufacturing data, in anything that could let the district court actually make a determination of fact, and that's not a sort of a feeling. I have a feeling there are many tasers around, which is really all they've supplied. It's conclusory, and it's speculative, and that's actually exactly what this court did in Gomez. It said there's not a basis, a credible basis to conclude on the record here that a firearm with its serial number obliterated is a weapon used for lawful purposes. It wasn't even a finding that that weapon is not an arm. It was a finding that there wasn't a basis, really, to make that conclusion, and that's all that I'm saying here. Unless the Court has further questions, I ask this Court to affirm. Okay, go ahead. So, thank you. So, Officer Bly, I do have one question.  So this is nothing. If we were to affirm, that would be the end of the litigation? It would be the end of the litigation. I mean, this is a – Ms. Bergstrom is going to – In the sense that there's nothing – The end of this litigation for our purposes, the end of the litigation over which we have any control, right? That's right. In the sense that there's nothing – there's no other claims left in the case here. But also, this is a facial challenge being brought sort of in the abstract to challenge our laws, and I'm not saying – we haven't had the opportunity, and the District Court hasn't had the opportunity to actually assess the validity of our laws, which could be presented by any plaintiff in the future. We're not – there's no holding here that stun guns are not arms, that the stun gun ban is lawful. All we have here is just that these plaintiffs didn't do what they needed to do to proceed into the Second Amendment analysis in more depth. Okay. Thank you very much. Thank you. Thank you. So, Mr. Bergstrom, I think maybe you heard the argument, and the suggestion is that you're tilting the windmills a little bit where there's no holding that stun guns are not arms or the tasers are not arms. There's a very narrow holding that you didn't put in any admissible evidence, either as to the number or as to the lawful purpose. Your Honor, I think the holding below was that stun guns are not arms. Now, it was based on the record, and the District Court certainly emphasized that it was making that holding based on the record before it, but the holding was that it's not arms. Show me where in that suggestion it says stun guns are not arms. Well, Your Honor, he made stun guns being in common use a prerequisite to finding they're arms, and as a result of them not being, I mean, the only way to explain why he didn't analyze whether the Second Amendment was historically okay with a ban on tasers is to assume that we got, is to hold that we were out at the plain text stage. So, this really ended the analysis before any of the Second Amendment analysis began, this conclusion. So, I'm not combating this or fighting this, but I think that the city's view is, and I think it's borne out by the record, it's a very narrow decision, which is if you had put in some evidence of common use, some admissible evidence of common use, then we would have gotten to the issue of whether stun guns are arms that are within the protection of, come within the protection of the plain text of the Second Amendment. And you didn't do that. And so, okay, but someone else might put in some of this evidence and prevent it and get to the second step and so on. So, what is your answer to that? Sure. So, the conclusion that I was looking for is on S.A. 20 in the record, where he says no reasonable jury could return a verdict if stun guns and tasers are presumptively protected by the Second Amendment at Step 1. On this record? Right. So, yes. So, right. On this record. So, Your Honor, to answer your question, yes, somebody else could bring a separate suit and raise potentially file evidence that shows evidence of the type that the district court was looking for, that stun guns are arms. But I'd like to point out that that is not what the Supreme Court has ever required in this context. Justice Alito, as my friend on the other side mentioned, in Caetano, his conclusion was based on the Volokh article that we've cited here. That was enough for Justice Alito. In Heller, it was enough for a majority of the Supreme Court that a social science paper by Gary Kleck established that handguns were in common use. So this is the sort of way that courts have been deciding these issues. Handguns and electronic guns pose very different issues. You're right, Your Honor. And I actually think the issues with electronic guns are significantly less severe than with handguns. My point is that when Heller was asking are these common, it didn't have a bunch of record evidence proving that handguns are common. It had a social science paper. That's the same sort of evidence that the district court had before it here, and it should have considered. So, yes, you could have presented this case in a different way, and the district court maybe would have come to a different conclusion. But based on the way it was presented, he should still have come to a different conclusion. I see that my time is out. If there's any further questions, I'd be happy. No, thank you very much. Thank you both. Thank you. I appreciate it. It was a very helpful argument, and we'll reserve the decision again, obviously.